**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:23-cr-114 |
| vs. | : | Judge Timothy S. Black |
| SAMUEL RANDAZZO, | : | |
| Defendant. | : | |

**ORDER DENYING DEFENDANT'S MOTION
FOR INTRADISTRICT TRANSFER**

This criminal case is before the Court on Defendant Samuel Randazzo's motion for and declaration in support of intradistrict transfer pursuant to Fed. R. Crim. P. 18 (Doc. 19), as well as the parties' responsive memoranda and exhibits (Docs. 21, 22).

**I. BACKGROUND**

On November 29, 2023, Defendant Samuel Randazzo was charged by way of an eleven-count Indictment with the following offenses: conspiracy to commit travel act bribery and honest services wire fraud, in violation of 18 U.S.C. § 371 (Count 1); travel act bribery, in violation of 18 U.S.C. § 1952(a)(3) (Counts 2 and 3); honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 (Counts 4 and 5); wire fraud, in violation of 18 U.S.C. § 1343 (Count 6); and illegal monetary transactions, in violation of 18 U.S.C. § 1957 (Counts 7 to 11). (Doc. 3).

Specifically, from April 2019 until November 2020, Defendant, by appointment of Ohio's Governor, served as the Chairman of the Public Utilities Commission of Ohio ("PUCO"). (*Id*. at 1). PUCO is a state agency responsible for regulating utility services

in Ohio and, as PUCO's chairman, Defendant was an agent and employee of the State of Ohio. (*Id*. at 1-2).¹ Prior to his PUCO appointment, Defendant worked for a private law firm and, from 1992 to January 2019, served as general counsel for "Industry Group 1," which was "a group of industrial energy users throughout Ohio, … created to further the interests of the individual members." (*Id*. at 2).

In Count 6 of the Indictment, the Government alleges that, from 2010 to March 2019, Defendant used his position as general counsel to defraud and embezzle funds belonging to Industry Group 1. (*Id*. at 16-18). However, the remaining counts of the Indictment (Counts 1-5, 7-11) focus on the circumstances that led to and occurred during Defendant's tenure as PUCO Chairman, specifically as they relate to Defendant's relationship with an Ohio-based public utility company, FirstEnergy.² In sum, the Government alleges that Defendant, along with FirstEnergy executives, conspired to and did use Defendant's position as a public official (*i.e.*, PUCO Chairman) to engage in

---

¹ PUCO's mission, as stated on its website, is "to assure all residential and business consumers access to adequate, safe and reliable utility services at fair prices, while facilitating an environment that provides competitive choices." (*Id*. at 1); PUCO Mission and Commitments, Ohio Public Utilities Commission, puco.ohio.gov/about-us/resources/mission-and-commitments (last visited Mar. 18, 2024). Under Ohio law, PUCO is led by five public utilities Commissioners. (Doc. 3 at 1). The Governor is responsible for appointing PUCO Commissioners and must also designate one Commissioner to serve as chairperson. (*Id*.) The Governor selects appointees from a list of candidates, provided by the PUCO Nominating Council. (*Id*.)

² For the sake of simplicity, the Court uses "FirstEnergy" broadly, encompassing the parent company and its subsidiaries. Moreover, while the Indictment refers to FirstEnergy as "Company A," the Court refers to the actual identity of the company, given that the identity is relevant to the Court's analysis, *infra*.

2

extensive acts of fraud and bribery, all for the benefit of Defendant, the co-conspirators, and FirstEnergy.

Notably, the instant case is not the first time that FirstEnergy has been at the crux of criminal charges before this Court.

On July 30, 2020, a federal Grand Jury returned a one-count Indictment, charging the former Speaker of the Ohio House of Representatives, Larry Householder, and five co-defendants, with participating in a Racketeer Influenced and Corrupt Organizations ("RICO") conspiracy, in violation of 18 U.S.C. § 1962(c), (d). *United States v. Householder, et al.*, No. 1:20-cr-77 (S.D. Ohio, Jul. 30, 2020). In short, the RICO charge related specifically to the *Householder* defendants' role in soliciting and accepting bribes from FirstEnergy, in exchange for Householder using his position as Speaker to secure legislation that offered a financial "bail out" to one of FirstEnergy's otherwise bankrupt subsidiaries. Ultimately, three of the *Householder* defendants pleaded guilty, one died, and the remaining two were convicted following a seven-week jury trial.

Then in July 2021, one year after the *Householder* defendants were indicted, FirstEnergy was separately charged in a one-count Information with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, 1349. *United States v. FirstEnergy Corp.*, No. 1:21-cr-86 (S.D. Ohio, Jul. 22, 2021). The charge, for which FirstEnergy entered into a Deferred Prosecution Agreement, relates specifically to FirstEnergy's role in bribing Householder **and** Defendant Randazzo, in exchange for specific official action to benefit FirstEnergy.

3

Both the *Householder* case and the related *FirstEnergy* case were filed in the Southern District of Ohio ("OHSD"), Western Division at Cincinnati, and both cases were assigned to this Court.

In the instant case, Defendant Randazzo faces charges for his own alleged role in the same scheme underlying *Householder* and *FirstEnergy*. Like *Householder* and *FirstEnergy*, Defendant's case was filed in Cincinnati. And two OHSD District Court Judges (including this Judge) have already found that Defendant's case is related to *Householder* and *FirstEnergy*. (Doc. 8); *see* S.D. Ohio Crim. R. 12.1(e). Nevertheless, Defendant moves this Court for an intradistrict transfer, so that his case may be tried in OHSD's Eastern Division at Columbus. (Doc. 19). As fully set forth, *infra*, the Court finds that Defendant's request is not well-taken and, therefore, the motion is **DENIED**.

## II. STANDARD OF REVIEW

Pursuant to Rule 18 of the Federal Rules of Criminal Procedure:

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

Fed. R. Crim. P. 18; *see also* U.S. Const. amend. VI ("the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed …").

Notably, while Rule 18 and the Sixth Amendment "require that a defendant's trial take place in the *district* where the crime was committed, there is no constitutional or

4

statutory requirement that a defendant's trial take place in a specific courtroom or *division* within a federal judicial district." *United States v. Erwin*, 155 F.3d 818, 824 (6th Cir. 1998) (citations omitted) (emphasis in original). Rather, "[t]he assignment of cases *within a district* is a matter within the exclusive domain of the local district judges." *United States v. Lewis*, 504 F.2d 92, 98 (6th Cir. 1974) (emphasis added).

Ultimately, the District Court has wide discretion in selecting the place of trial. *Id*. at 97-98 (collecting cases). In exercising its discretion, the Court must give "due regard" to the Rule 18 factors, *i.e.*, "the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." Fed. R. Crim. P. 18.

### III. ANALYSIS

Defendant moves for intradistrict transfer, arguing that the Rule 18 factors weigh in favor of moving this case from Cincinnati to Columbus. (Doc. 19).

Specifically, Defendant argues that the "key events in the indictment either allegedly occurred in the Eastern Division (Columbus) or outside the Southern District entirely (Akron)" and that "the likely witnesses … and the alleged victims" reside and work in either Columbus or in the Northern District of Ohio. (Doc. 19-1 at 5, 16-19). Defendant further notes that he himself lives in Columbus, and that his age, health, and financial status render it unfairly burdensome for him to either commute to or stay in Cincinnati for the duration of what he anticipates will be a lengthy trial. (*Id*. at 5, 12-16). Defendant also asserts that his "inconvenience would be further compounded by the burden faced by his Columbus-based counsel, friends, and family members should they have to travel to Cincinnati for trial." (*Id*. at 5). Finally, Defendant argues that a transfer

5

would have minimal impact on the prompt administration of justice, because Columbus has the judicial resources and ability to absorb this case, and because this Court's prior experience with *Householder* and *FirstEnergy* is not sufficiently helpful to warrant keeping the case in Cincinnati. (*Id.* at 6, 19-23). Defendant also states that he will waive his speedy trial rights for any length of time necessary to facilitate the transfer. (*Id.*)

The Government opposes Defendant's motion to transfer the case. (Doc. 21). Specifically, the Government argues that Defendant vastly underestimates the extent to which this Court's prior experience with *Householder* and *FirstEnergy* will facilitate the prompt administration of justice. (*Id.* at 3-9). The Government further notes that Defendant cannot alleviate the impact and inefficiency of transfer by simply waiving the right to a speedy trial, given that the right is not his alone to waive. (*Id.* at 8). The Government also argues that Defendant's assertions are speculative as to the convenience of witnesses and are incorrect as to consideration for the victims. (*Id.* at 2, 9). Finally, the Government offers argument to undermine Defendant's position that trial in Cincinnati would unduly inconvenience and impact his health, finances, counsel, and support system. (*Id.* at 10-12).

### A. Convenience of Defendant

Defendant first argues that "[a] trial in Cincinnati would create significant physical, financial, and/or logistical burdens." (Doc. 19-1 at 13). Defendant notes that his home in Columbus is just over 100 miles from the Cincinnati courthouse, equating to a roughly two-hour drive each way. (*Id.*) Defendant further states that he suffers from sciatica, resulting in physical pain that is exacerbated by prolonged periods of sitting.

6

(*Id.*) Accordingly, Defendant argues that a daily four-hour roundtrip commute would be physically and logistically taxing, and would therefore interfere with his ability to effectively participate in his defense and to receive a fair trial. (*Id.*; Doc. 19-2 at ¶ 10).

Defendant also argues that avoiding the commute by staying in Cincinnati is equally untenable, due to his financial circumstances. (Doc. 19-1 at 14). Specifically, Defendant asserts that, currently, his sole source of income is from Social Security and his retirement plan distributions. (*Id.*; Doc. 19-2 at ¶ 11). Defendant further states that he and his company—along with a number of the defendants and key players in the *Householder* and *FirstEnergy* cases—are the subject of a civil enforcement action brought by the Ohio Attorney General in the Franklin County Court of Common Pleas; and as a result of that civil action, assets previously available to Defendant are now encumbered by pre-judgment attachment and garnishments.[3] (Doc. 19-1 at 10, 14; Doc. 19-2 at ¶ 11). Accordingly, Defendant argues that he does not have the financial means to shoulder the cost of travel, food, and lodging for himself and counsel.

Defendant also argues that staying in Cincinnati for the duration of trial would disrupt his counsel—specifically, Roger P. Sugarman, Esq.—who is already based out of

---

[3] Although not an initial party to the civil enforcement action, Defendant and his company, Sustainability Funding Alliance of Ohio, Inc. ("SFA"), were added in August 2021. *State ex rel. Yost v. FirstEnergy Corp.*, Franklin C.P. No. 20-CV-006281 (Aug. 5 & 17, 2021). Shortly thereafter, the State moved *ex parte* for pre-judgment attachment of Defendant's and SFA's property, alleging that Defendant was transferring and liquidating assets, in an effort to essentially render himself judgment-proof. *Id.*, No. 20-CV-006281 (Aug. 12, 2021). On August 12, 2021, the Franklin County Court of Common Pleas issued Orders for pre-judgment attachment of Defendant's property, other than personal earnings. *Id.* The Orders were initially vacated on appeal, but ultimately reinstated by the Supreme Court of Ohio on January 29, 2024. *State ex rel. Yost v. FirstEnergy Corp.*, Slip Opinion No. 2024-Ohio-101 (Jan. 16, 2024).

Columbus.[4] (Doc. 19-1 at 14-15). Defendant argues that, even if it were financially feasible to pay for Mr. Sugarman to stay in Cincinnati for the duration of the trial, "Mr. Sugarman would face the practical burden of preparing for a trial in Cincinnati, but focused on conduct that allegedly took place in Columbus, away from the resources of his office in Columbus." (*Id*. at 15). Defendant acknowledges that such an inconvenience is commonplace for trial attorneys, but argues it is an unnecessary complication that can be alleviated by a transfer to Columbus. (*Id*.)

Finally, Defendant notes that he has "resided in Columbus continuously for more than 50 years," and "many of [his] closest friends and family reside in the Columbus area." (*Id*. at 15). Defendant argues that holding the trial in Cincinnati would deter some of these individuals from attending, thereby depriving him of his full support system. (*Id*. at 15-16).

To start, "the mere fact that a defendant's home is nearer one trial site than another is insufficient to merit transfer." *United States v. Forlani*, No. 1:11-cr-491, 2012 WL 3524751, at *3 (N.D. Ohio Aug. 14, 2012) (quoting *United States v. Afflerbach,* 754 F.2d 866, 869 (10th Cir. 1985)). Nevertheless, the Court acknowledges the difficulties of making a lengthy daily commute. But the commute to Cincinnati would only be required for the duration of the trial (and possibly one or two pretrial hearings), and can be accomplished in roughly an hour and 45 minutes each way (or less, if timed to avoid

---

[4] Co-counsel Andrew R. DeVooght, Esq. is based out of Chicago and, therefore, will need to travel to Ohio for trial regardless.

8

traffic)—none of which is wholly unreasonable.[5]  Indeed, many people are required to undertake similar or longer daily commutes, including some jurors.

Additionally, the Court further acknowledges that Defendant suffers from sciatica and that the pain is exacerbated by prolonged periods of sitting.  Notably, however, the trial itself will require Defendant to remain seated in a courtroom, for up to eight hours a day, in roughly two-hour increments.  In other words, eliminating the commute is <u>not</u> going to alleviate the problem.  Moreover, Defendant states in his affidavit that his sciatica pain is mitigated by spinal injections.  (Doc. 19-2 at ¶ 10).  Therefore, it would appear that the solution to Defendant's medical concern would be more effectively and appropriately addressed through a medical professional, rather than this Court.

In short, while driving to Cincinnati each day is certainly *less* convenient than simply remaining in Columbus, the task is not an insurmountable feat nor is it a wholly unreasonable undertaking for the limited duration of a jury trial.

That said, the alternative (and more common) approach to commuting is, of course, for Defendant and counsel to simply stay in Cincinnati during the duration of trial.  In that regard, the Court is not persuaded that Defendant is unable to bear the cost of lodging and related expenses.

At the start of this case, the U.S. Pretrial Office interviewed Defendant and prepared a Pretrial Report for the Court's consideration of bond.  (Doc. 18).  During that

---

[5] According to Google Maps, the distance from Defendant's home in Columbus to the courthouse in Cincinnati, door to door, is 107 miles and takes 1 hour and 45 minutes (based on a 9:00 a.m. arrival time).  The distance from Defendant's home in Columbus to the Columbus courthouse is 2 miles, but is estimated to take 11 minutes by car.

interview, Defendant told Pretrial that he receives $3,900 per month from social security, collects $1,700 per month in rental income from one of his properties, and that he is currently taking <u>minimum</u> distributions from his retirement account (the value of which was neither specified in the Pretrial Report nor clarified in Defendant's filings). (*Id.* at 2). Additionally, Defendant reported a fairly significant amount of cash on hand between his savings and checking accounts.[6] (*Id.*) And Defendant owns and/or controls numerous other assets, including, *inter alia*, a storage building and another residence—albeit technically owned by SFA, of which Defendant is the sole owner—and three separate vehicles that Defendant reports are fully paid off.[7] (Doc. 18 at 2).

---

[6] In its opposition, the Government notes that, after the FBI searched Defendant's residence, Defendant transferred $3 million to his attorneys (specifically, Mr. DeVooght's law firm, Loeb & Loeb), although the availability of the funds was unclear at the time of the filing. (Doc. 21 at 10; Doc. 21-1 at 2). In his reply, Defendant stated that none of those funds are currently available to him for personal use, as some of the money has already been spent on legal fees, another portion of the funds is held in an account that has been frozen as a result of the Ohio civil enforcement action, and the remainder of the funds constitute pre-payment to, and are therefore the property of, Loeb & Loeb, for legal fees and costs relating to the firm's representation of Defendant in criminal proceedings. (Doc. 22 at 6; Doc. 22-3 at 2-3). As an aside, it is not clear whether Defendant's agreement with Loeb & Loeb specifically precludes the use of those funds to also pay for costs relating to Mr. Sugarman (whose appearance and participation as local counsel is required, given that Mr. DeVooght appears in this case *pro hac vice*). *See, e.g.,* S.D. Ohio Civ. R. 83.3(f) ("Unless otherwise ordered, an attorney admitted *pro hac vice* may not serve as the Trial Attorney for any party"); S.D. Ohio Civ. R. 83.4(a) (requiring the Trial Attorney to sign all pleadings and attend all hearings, conferences, and trial).

[7] The Pretrial Report does not specify the value of the SFA properties, nor whether they generate any form of income. Nevertheless, the Court has no evidence to suggest that the properties are not being used or could not be used to generate income, if necessary. Next, the Government's attached exhibit identifies the estimated values of two of Defendant's vehicles, which were worth $40,000 in total as of August 2021—though the Court acknowledges the cars have surely depreciated in value since that time. (Doc. 21-1 at 3). Finally, Defendant advised Pretrial that he and his wife maintain separate finances. Therefore, the assets and income referenced in this Order do not include, nor will the Court consider, additional properties and vehicles owned by, or any cash or income attributable to, Defendant's spouse.

10

Additionally, the Court finds that Defendant's estimated cost to stay in Cincinnati is highly overinflated. That is, Defendant provides the Court with an estimate of nearly $13,000 "for a four-week stay in two standard rooms (one for [Defendant] and one for Mr. Sugarman) at the Holiday Inn in downtown Cincinnati." (Doc. 19-1 at 10, n. 4). While the Court does not doubt the accuracy of this figure, it is important to note that other, far more reasonably priced accommodations, are available. Indeed, a cursory online search for month-long rentals in Cincinnati evidences that there are numerous options for conveniently located three-bedroom residences (which, notably, would accommodate not only Defendant and Mr. Sugarman, but Mr. DeVooght, as well), for an average of less than $3,000 per month—a <u>fraction</u> of the cost Defendant cites for just two hotel rooms.[8]

In short, considering the more realistic cost of accommodations, as well as Defendant's finances—even based on his social security and retirement distributions alone—the Court concludes that staying in Cincinnati for the duration of the trial would neither be a cost-prohibitive option, nor would it meaningfully increase the monetary inconvenience to Defendant.

Next, the Court considers the inconvenience to counsel if he were required to travel to Cincinnati for trial. As previously stated, Defendant raises this argument as to

---

[8] It also bears reiterating that Mr. DeVooght is based in Chicago and, therefore, will need Ohio accommodations during the trial—whether that be a single-person rental in Columbus or a shared residence with Defendant and Mr. Sugarman in Cincinnati. Notably, however, the prices for accommodations in Columbus are moderately higher than Cincinnati. Indeed, if Defendant were to pay for month-long accommodations in Columbus for Mr. DeVooght only, it would yield but a modest savings over the defense team all staying in Cincinnati.

11

Mr. Sugarman only, given that Mr. DeVooght would need to travel from Chicago regardless.  Notably, however, as raised in the Government's opposition and clarified in Defendant's reply, while Mr. Sugarman maintains his home, office, and practice in Columbus, Ohio, he also (since 2017) spends part of the year in Florida—primarily during the winter months.  (Doc. 21 at 12; Doc. 22 at 8-9;  Doc. 22-2 at 2-3). Specifically, Mr. Sugarman explains in his supporting affidavit that he is currently in Florida, having left in December 2023, and that he intends to return to Ohio in May 2024. (*Id*. at 3, ¶ 5).  Given that Mr. Sugarman continues to maintain a residence and office in Columbus, Defendant argues that holding trial in Columbus would avoid the costs and inconvenience of having Mr. Sugarman travel to Cincinnati.

The Court acknowledges that Mr. Sugarman maintains a residence and practice in Columbus, but nevertheless finds that no undue burden or prejudice arises from requiring Mr. Sugarman to travel to Cincinnati instead.  As noted, *supra*, lodging is readily available in the area (at <u>considerably</u> less cost than Defendant calculates).  And as to the availability of Mr. Sugarman's office, the Cincinnati courthouse has spacious, private workspace for Defendant and his attorneys to use continuously throughout the duration of the trial—indeed, this Court always reserves the workspace for the defense to use during any criminal trial.  Moreover, given Mr. Sugarman's professional experience, as well as his familiarity with working remotely from Florida for several months per year, the Court has no concerns over Mr. Sugarman's ability to work remotely from Cincinnati. Accordingly, the Court finds no added inconvenience to counsel.

12

Finally, as to Defendant's friends and family, Defendant's motion states that a Cincinnati trial would "discourage attendance <u>by at least some</u> of these individuals." (Doc. 19-1 at 15) (emphasis added). In other words, Defendant acknowledges that a Cincinnati trial would not entirely eliminate the ability of his friends and family to attend. Moreover, as the Government notes, and as Defendant's Pretrial Report confirms, of Defendant's immediate family (apart from his wife), only one person—his son—resides in Columbus. (Doc. 18 at 2; Doc. 21 at 11-12). Indeed, Defendant advised Pretrial that his parents are deceased, one sibling lives in Texas, two siblings reside north of Akron, and his daughters live in Los Angeles. (Doc. 18 at 2). Thus, Defendant's closest family members would need to travel regardless of whether the trial were in Cincinnati or Columbus.[9]

In sum, while the Court acknowledges that a trial in Columbus would certainly be *more* convenient to Defendant, the Court cannot conclude that holding the trial in Cincinnati would pose a significant inconvenience, nor would it in any way prejudice or harm Defendant's case or constitutional rights. Thus, the Court finds that this Rule 18 factor (*i.e.*, "convenience of the defendant") weighs only slightly in favor of Defendant's requested transfer.

---

[9] As an aside, in this Court's experience, it is uncommon for the entirety of a defendant's support system (other than a spouse or, at times, a parent) to be present for each and every day of trial. Of course, the Court cannot speak to the intent of Defendant's support system. But, based solely on this Court's experience, any inconvenience caused to friends and family by traveling to Cincinnati is unlikely to be a daily imposition.

13

**B. Convenience of Witnesses and Consideration of Victims**

Next, Defendant argues that holding trial in Columbus would be more convenient for likely witnesses and alleged victims. (Doc. 19-1 at 16-17).

Specifically, as to witnesses, Defendant "anticipates there could be anywhere from two to three dozen witnesses called during trial," including "current and former PUCO Commissioners and members of the PUCO staff; the members of Ohio's executive branch of government; current and former Ohio state legislators; and representatives of Industry Group 1 and [FirstEnergy]." (*Id.*) And Defendant asserts that "the vast majority of these likely witnesses work and reside in the Columbus area, or, at the least, closer to Columbus than Cincinnati." (*Id.* at 16). Defendant further notes that there are unlikely to be any witnesses who work or reside in Cincinnati. (*Id.* at 17). Thus, Defendant argues that "trial in Cincinnati would pose significant inconvenience to nearly all of the likely witnesses in this case[.]" (*Id.*)

In response, the Government argues that the prosecution is likely to call most of the witnesses in this case, and that the Government does not believe a Cincinnati-based trial would pose an inconvenience to these witnesses. (Doc. 21 at 9). The Government further notes that, in the similarly-situated *Householder* case, the prosecution called 28 witnesses, most of whom traveled into Cincinnati without issue.[10] (*Id.*)

---

[10] As far as the Court recalls, the only travel-related inconveniences during the *Householder* trial included: (1) a witness who traveled internationally and then had to remain in the United States a few days longer than anticipated due to a delay in the testimony; and (2) an out-of-state witness whose travel needed to be rescheduled for a later date due the witness's health. Notably, neither of these issues were caused nor exacerbated by the trial being held in Cincinnati, nor would these issues have been avoided had the *Householder* case been tried in a different division.

14

At this stage of the proceedings, the Court does not have a specific list of anticipated witnesses from either party.[11] However, based on the allegations, this Court expects that the likely witnesses would include FBI agents involved in the investigation, state officials and/or staff, PUCO Commissioners and Nominating Council members, representatives from FirstEnergy and Industry Group 1, and perhaps some expert witnesses. In that regard, there is likely to be considerable overlap between the witnesses in this case and the witnesses in the *Householder* case—that is, many of the witnesses in the instant case are likely to be the same witnesses or similarly situated witnesses to those called during the *Householder* trial. Thus, this Court's prior experience with *Householder* is relevant and helpful to the analysis.

To start, the time, effort, and stress of being called to testify as a witness is going to pose an inconvenience for most people, regardless of location. Moreover, unless a witness actually resides in the Columbus-area, the witness will need to travel some extended distance to arrive at the courthouse—whether in Columbus or Cincinnati.[12]

---

[11] The Court's typical criminal trial calendar requires parties to submit an anticipated witness list to the Court roughly three weeks prior to the start of trial and, further, allows the witness list to be submitted *ex parte*. The Court then instructs the parties to exchange their witness lists with one another the week before trial commences, unless either party raises specific safety or strategic concerns. Similarly, for the sake of convenience and efficiency, the Government will typically agree to provide the defense with Jencks material a week or two before trial. However, the Government is not required, and the Court cannot require, the production of Jencks material to the defense until a witness has testified. 18 U.S.C. § 3500(a).

[12] Notably, given that Cincinnati is located in the southwest corner of Ohio, whereas Columbus is more centrally located, the argument that Ohio-based witnesses are generally closer to Columbus than Cincinnati is virtually always going to be true. Thus, placing undue weight on geographic proximity alone would essentially favor Columbus in every case involving Ohio-based, non-local witnesses.

Thus, a modest difference in travel time is unlikely to be the major contributing factor to an out-of-town witness' inconvenience. Accordingly, the Court places less emphasis on how far a witness will need to travel and, instead, looks primarily at whether a witness must travel at all.

In that regard, without a final witness list, Defendant's argument that the vast majority of witnesses are likely to reside in Columbus is speculative. Indeed, it bears noting that the charged conduct dates back to 2018 and, therefore, even a witness who may have resided in Columbus at the time of the alleged offense may no longer reside there today. Moreover, as Defendant acknowledges, FirstEnergy is based in Akron. Additionally, while PUCO and the state legislature are Columbus-based, the actual council members, commissioners, and officials can be, and typically are, residents of other cities all over Ohio. And, of course, anyone called to testify as an expert, or a witness called for purposes of authentication, could reside anywhere in the United States. In short, the only likelihood in this case is that most witnesses will have to endure the inconvenience of traveling out of town, regardless of whether the trial is held in Cincinnati or Columbus. Accordingly, the Court finds that transfer would not serve any meaningful purpose in terms of witness convenience.

As to alleged victims, the Court finds Defendant's argument to be too narrowly focused on Industry Group 1. To be sure, Industry Group 1 is a named victim of the alleged offense in Count 6. But that is not to say that the remainder of the Indictment fails to identify any alleged victims. Rather, the crux (and, indeed, the majority) of the Indictment charges alleged conduct that harmed the citizens of Ohio as a whole. In other

16

words, the citizens of any city in Ohio, including Cincinnati, all have an equal interest in the outcome of the case. Thus, the Court finds that Cincinnati is equally convenient to the victims in this case.

### C. Prompt Administration of Justice

Finally, Defendant argues that intradistrict transfer would not frustrate the prompt administration of justice. Specifically, Defendant asserts that while the *Householder* case may have some overlap with the instant case, "the charges and relevant evidence in the two cases are very different," and thus this Court's prior experience with *Householder* "will not materially advance the 'prompt administration of justice'"; and the Court's experience with the *FirstEnergy* case alone is not sufficient to warrant keeping the case in Cincinnati. (Doc. 19-1 at 6, 21-23).

To start, pursuant to OHSD's Local Rules:

> [C]ases may be deemed related by the Court <u>if they appear to arise from the same or a substantially identical transactions, happenings, or events</u>, including any alleged conspiracy. This Rule is <u>intended to provide for the orderly division of the business of the Court</u> and does not grant any right to any litigant.

S.D. Ohio Crim. R. 12.1(e) (emphasis added). Thus, the Local Rules provide for related cases to be tried by the same District Judge, in order to promote proper docket management and ensure efficient case disposition (*e.g.*, not requiring two different Judges to separately expend time and effort to review and resolve substantively similar issues).

17

Here, as previously stated, two OHSD District Court Judges (including this Judge) have already found that, pursuant to the Local Rules, Defendant's case is related to *Householder* and *FirstEnergy*. (Doc. 8); *see* S.D. Ohio Crim. R. 12.1(e).

In that regard, the Court first notes that the offenses charged in the instant case are not dissimilar to the charges in *Householder* and *FirstEnergy*. Specifically, in *Householder*, the Government charged a RICO conspiracy, for which the predicate acts included, *inter alia*, honest services wire fraud, Travel Act bribery, and illegal monetary transactions. In the instant case, Defendant is charged (albeit, as substantive counts rather than RICO predicates) with those same offenses—*i.e.*, honest services wire fraud, Travel Act bribery, and illegal monetary transactions (Counts 1-5, 7-11). In *FirstEnergy*, the Government charged one count of conspiracy to commit honest services wire fraud and, similarly, Defendant is charged with conspiracy to commit honest services wire fraud (Count 1), as well as two individual counts of honest services wire fraud (Counts 4 and 5). And, notably, the conspiracy charged in the instant case is effectively contained within the *FirstEnergy* conspiracy charge—essentially, FirstEnergy was charged with bribing Defendant, and now Defendant is charged with accepting those bribes.

That said, the Court acknowledges that the specific alleged conduct underlying Defendant's charges is different from the specific conduct in the *Householder* case. But that is not to say that the cases are substantively unrelated. Indeed, the thrust of the Government's allegations, across all three cases, is that FirstEnergy engaged in a scheme of identifying official acts that would benefit the company and then bribing any state official or employee who could deliver on those acts. The cases vary only to the extent

18

that FirstEnergy pursued its end goal from multiple different angles and, therefore, relied on different individuals to accomplish different aspects of the scheme at large. But, at its core, the allegations all emanate from FirstEnergy and involve the same overall scheme, means, and goal, albeit using different players who held different positions of authority.[13]

Given the nature of the charges and the similarities between the instant case, *FirstEnergy*, and *Householder*, there will inevitably be overlapping legal arguments, evidentiary issues, relevant players, and general background information. Thus, the Court's prior experience with this group of related cases will serve as an asset in ensuring the "prompt administration of justice."

To be clear, this is not to say that any of the Court's esteemed Columbus-based colleagues could not effectively take over for this Court. But it is unquestionably more efficient for this Court to continue presiding over a case involving issues, allegations, and context that the Court is already familiar with, rather than for another Judge to start anew.

Therefore, given this Court's extensive efforts in and experience with the related cases (particularly *Householder*), maintaining this case before this Court in Cincinnati would avoid delays and accomplish consistency and efficiency across the board. Thus, keeping the case in Cincinnati would best serve the prompt administration of justice.

---

[13] In other words, rather than charging what would have essentially been a broad, and potentially rimless, hub-and-spokes conspiracy, the Government has broken up the allegations and is pursuing alleged actors or conspiracies separately. Among other things, this ensures that individual defendants are not prejudiced by their mere association with the central entity, *i.e.*, FirstEnergy.

19

## IV. CONCLUSION

Having considered the Rule 18 factors, the Court finds that an intradistrict transfer is unwarranted. Accordingly, based upon the foregoing, Defendant's motion for intradistrict transfer (Doc. 19) is **DENIED**.

**IT IS SO ORDERED.**

Date: 3/28/2024

*Timothy S. Black*
Timothy S. Black
United States District Judge